# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2409

_____

Wayne Anderson,

          Appellant,

    v.

Cass County, Missouri; Joseph Schaefer, in his individual and official capacity; Rick Aldridge, in his individual and official capacity; Mitch Phillips, in his individual and official capacity; Steve Whitmore, in his individual and official capacity; Shawn Wegers, in his individual and official capacity; Jason Giaconne, in his individual and official capacity,

          Appellees.

_____

Timothy Gilio,

          Appellant,

    v.

Cass County, Missouri; Joseph Schaefer, in his individual and official capacity; Rick Aldridge, in

Appeal from the United States
District Court for the
Western District of Missouri.

his individual and official capacity;   *
Mitch Phillips, in his individual   *
and official capacity; Steve   *
Whitmore, in his individual and   *
official capacity; Shawn Wegers, in   *
his individual and official capacity;   *
Jason Giaconne, in his individual   *
and official capacity,   *
  *
            Appellees.   *

_____

Submitted: January 14, 2004

Filed: May 5, 2004
_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.
_____

SMITH, Circuit Judge.

Wayne Anderson and Timothy Gilio, licensed bondsmen, sued Cass County, Missouri, and Sheriff's Deputies Mitch Phillips, Jason Giaconne, Rick Aldridge, Steve Whitmore, Shawn Wegers, and Joe Schaefer (collectively "Cass County deputies"), alleging that the deputies lacked probable cause to arrest them and, therefore, violated their federal constitutional rights under 42 U.S.C. § 1983. The district court[1] granted Cass County and its deputies' motion for judgment as a matter of law. Anderson and Gilio appeal arguing that the district court erred in finding no

_____

[1] The Honorable Fernando J. Gaitan Jr., United States District Judge for the Western District of Missouri.

-2-

legally sufficient evidentiary basis for a reasonable jury to find in their favor. For the reasons stated below, we affirm.

## I. *Background*

Gilio Bail Bonds and Christy Shamp entered into a bond contract in October 1999 to secure Shamp's future court appearance. Gilio, perceiving Shamp to be a flight risk, decided to revoke her bond. About 3:30 a.m., on November 11, 1999, Anderson, Gilio, and Randall Gerrard,[2] a bounty hunter, arrived at Shamp's residence in Belton, Missouri. Gilio went immediately to the back of Shamp's home while Anderson and Gerrard remained in the front. Gilio, looking through a window, identified Shamp in the bedroom and signaled Anderson and Gerrard to knock on the front door. Shamp answered the door and let the men into her home. Gilio informed Shamp that they had come to revoke her bond.

According to Gilio, Shamp then became combative. Gerrard handcuffed Shamp, and Shamp attempted to escape by running outside. One of Shamp's neighbors, awakened by the commotion, observed Shamp running out of her house in handcuffs and being tackled and dragged back inside. The neighbor reported the incident to the Cass County Sheriff's Department. Deputy James Aldridge and Deputy Joseph Schaefer were dispatched to the residence.

Upon arrival, the deputies approached Shamp's residence and encountered Gerrard on the front sidewalk. Gerrard informed Aldridge that he was there to revoke a bond. While speaking with Gerrard, Aldridge heard commotion coming from inside. Aldridge, Schaefer, and Gerrard entered the residence.

When the deputies entered, Aldridge saw Gilio and Anderson standing over Shamp, who was crying, handcuffed with her hands behind her back, and sitting in

---

[2] On the record, Gerrard is also identified as "Gerard" and "Garrard."

a corner of the living room. Gilio and Anderson offered Aldridge their identification and a copy of the bond contract with Shamp. Gilio explained that Shamp necessitated her restraint because she had kicked him in the groin just before the officers arrived. After receiving identification, Aldridge stated that Anderson must be the "infamous Bo Anderson." Aldridge instructed Schaefer to take no part in the investigation because Schaefer and another Cass County deputy sheriff had filed a civil action against Gilio the day before.

Aldridge interviewed Shamp who explained how Gilio, Anderson, and Gerrard allegedly forced their way into her home and began to ask her questions about money she owed them. Shamp confirmed that she had been handcuffed by Gerrard, and that she had tried unsuccessfully to escape. Shamp stated that Anderson and Gilio had slapped her several times. Anderson and Gilio contradicted Shamp and represented that they had not touched her. According to Aldridge, Shamp's physical appearance supported her allegations that she had been handled roughly, observing "redness" around Shamp's face and neck.

Around 4:12 a.m., Deputy Mitch Phillips, the supervising officer, arrived. Phillips, as did Aldridge earlier, instructed Schaefer not to get involved in the investigation. Gilio told Deputy Phillips that he did not think he was well-liked in Cass County, and that he had "probably taken this incident too far." Phillips and Aldridge concluded that probable cause existed to arrest Gilio and Anderson for assault based upon their investigation at the scene. The deputies decided not to arrest Gerrard because he had only been accused of stopping Shamp's attempts to flee. Anderson and Gilio were told they were being arrested for assault, but were eventually charged with both burglary and assault.

Eventually, all charges were dropped against Anderson. Gilio was offered a charge of misdemeanor trespass in exchange for a guilty plea. Gilio entered an *Alford*

plea[3] to the amended charge. On July 26, 2001, Anderson and Gilio brought the present federal civil rights actions against Cass County and its deputies alleging that the arresting deputies had violated their federal constitutional rights.

This matter went to trial on May 12, 2003. In an order dated May 14, 2003, the district court granted Cass County deputies' motion for judgment as a matter of law after concluding that: (1) the appellants' arrest was supported by probable cause; (2) Gilio and Gerrard were not similarly situated; (3) there was not an evidentiary basis for the jury to find for the appellants on their constitutional claims. This timely appeal followed.

## II. *Discussion*

On appeal, Gilio and Anderson allege four reversible errors by the district court. Specifically, Gilio and Anderson contend that the court erred in: (1) granting Cass County deputies' motion for judgment as a matter of law as to their Fourth Amendment claims; (2) granting Cass County deputies' qualified immunity; (3) granting Cass County deputies' motion for judgment as a matter of law as to their Fourteenth Amendment claims; (4) refusing to admit into evidence their lost wages.

A district court may grant a motion for judgment as a matter of law once a party has been fully heard on an issue if the party has failed to establish any legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue. Fed. R. Civ. P. 50(a)(1). Such a ruling is appropriate only "when all the evidence

---

[3] "Unlike a defendant making an ordinary guilty plea, a defendant making an *Alford* plea maintains his innocence of the offense charged." *United States v. Johnson*, 326 F.3d 934, 936 n.2 (8th Cir. 2003) (citing *North Carolina v. Alford*, 400 U.S. 25, 37 (1970)).

points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party." *Ehrhardt v. Penn Mut. Life Ins. Co.*, 21 F.3d 266, 269 (8th Cir.1994). We review a grant of a judgment as a matter of law de novo. *Moran v. Clarke*, 296 F.3d 638, 642–43 (8th Cir. 2002). "Under such review, we do not weigh the evidence or make credibility determinations, but draw all factual inferences in favor of the non-moving party." *Anderson v. Independent School Dist.*, 357 F.3d 806, 809 (8th Cir. 2004).

## A. *Probable Cause to Arrest*

The first step in our analysis is to determine whether the Cass County deputies had probable cause to arrest Gilio and Anderson. If the deputies had probable cause, the arrests did not violate the Fourth Amendment and the deputies are not liable. *Peterson v. City of Plymouth*, 60 F.3d 469, 473 (8th Cir. 1995). Here, the district court found that the deputies had probable cause to arrest Gilio and Anderson. We agree.

"It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments." *Hannah v. City of Overland, Missouri*, 795 F.2d 1385, 1389 (8th Cir. 1986). In determining whether probable cause exists to make a warrantless arrest, a court will consider whether, based on the totality of the circumstances, the facts would justify a reasonably cautious police officer's belief that the individual arrested has committed or was committing an offense. *United States v. Oropesa*, 316 F.3d 762, 768 (8th Cir. 2003); *United States v. Wallraff*, 705 F.2d 980, 990 (8th Cir. 1983).

Anderson and Gilio raise three arguments supporting their claim that the deputies lacked probable cause to arrest.

*a. Bond Revocation Negates Criminal Intent*

First, Gilio and Anderson argue that because bond revocation is a civil action, the deputies lacked probable cause to arrest them. Probable cause can only exist in relation to criminal conduct. The appellants rely on *Peterson*, to support their contention that a civil action negates criminal intent. In *Peterson*, an officer violated a plaintiff's Fourth Amendment right when he arrested the plaintiff knowing that the plaintiff lacked criminal intent. *Id*. at 476. The officer charged the plaintiff with felony theft, in spite of the reports, tape recordings, and written statements before him demonstrating that the plaintiff, as landlord, had a reasonable and actual claim to the property he allegedly stole. *Id*. Based on the information before the officer, our Court concluded that the arresting officer was on notice that the plaintiff did not have criminal intent, therefore, the arrest was not supported by probable cause. *Id*. at 477.

*Peterson* is distinguishable from this case. Here, unlike in *Peterson*, the Cass County deputies made an arrest at the scene of an incident based upon the statement of the alleged victim, their observations of the alleged victim and an eyewitness who observed conduct contrary to the appellants' description of the events. Unlike the appellants suggest, *Peterson* does not stand for the blanket proposition that civil disputes always negate the elements of criminal intent.[4]

---

[4] The appellants also rely on *Kennedy v. Los Angeles Police Dept.*, 901 F.2d 702 (9th Cir. 1989), to support their contention that civil disputes negate criminal intent. The facts of the present case are readily distinguishable from the facts of *Kennedy*. In *Kennedy,* police officers lacked probable cause to arrest the plaintiff for grand theft because at the time of the arrest the officers knew that the plaintiff was holding her roommate's property as security until the roommate paid her debts owed to the plaintiff. *Id*. at 706. The court reasoned that there was no reasonable basis from which the arresting officers could believe that the plaintiff harbored criminal intent. *Id*. at 706. The court concluded that no one could believe that the plaintiff had the specific criminal intent to permanently deprive the former roommate of her property. *Id*. The court did not hold, as the appellants suggest, that civil disputes negate the elements of criminal intent.

While Anderson and Gilio told the deputies they entered Shamp's residence based upon their bond contract, a reasonable officer could have seen their conduct as potentially criminal in nature. When the deputies approached Shamp's home, one of the deputies heard commotion coming from inside suggesting that an altercation was occurring; the deputies were informed by Gerrard that he was there to revoke a bond; when Aldridge entered the residence he saw Shamp handcuffed and laying on the floor in a corner; Anderson and Gilio were crouched over Shamp when the deputies entered; Shamp testified that she had been assaulted by Anderson and Gilio; and Shamp's face and neck were red and swollen. After weighing all the evidence, we find that the deputies had probable cause to arrest Anderson and Gilio for assault. Given all the circumstances known to the arresting officers, we conclude that it was reasonable for the officers to consider Shamp's statements trustworthy.

### b. Trustworthy Information

Next, Anderson and Gilio argue that the deputies lacked reasonably trustworthy information from Shamp that negated probable cause for the arrest. As noted, during her interview with Deputy Aldridge, Shamp reported that she had been assaulted by both Anderson and Gilio. Shamp's physical appearance when the deputies entered her residence supported her allegations. Officers are "entitled to rely on the veracity of information supplied by the victim of a crime." *Peterson*, 60 F.3d at 474–75. Anderson and Gilio argue, however, that the facts and circumstances known to the officers when Shamp gave her statement made her allegations untrustworthy. In support of their contention, the appellants rely upon testimony that the deputies were aware that Shamp had a criminal history of writing bad checks; that the arresting officers had been to Shamp's residence on police business before; and that Shamp attempted to flee her bondsman. This evidence, however, does not establish that on the night of the alleged assault Shamp was untrustworthy.[5]

---

[5] In *Kiser v. City of Huron*, 219 F.3d 814, 815 (8th Cir. 2000), a suspect was arrested after his former girlfriend complained to the police that she had been

*c. Exculpatory Evidence*

Third, Anderson and Gilio contend that the arresting deputies ignored plainly exculpatory evidence that negated probable cause. In drawing factual inferences, officers must analyze all the evidence presented because it is the totality of the circumstances that determines the existence of probable cause. *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence . . . suggests that probable cause exists." *Id.* Here, relying on *Kuehl*, the appellants argue that the arresting deputies ignored exculpatory evidence–Gerrard had tackled her outside and brought her back inside–that negated the deputies' belief that the appellants had assaulted Shamp.

In *Kuehl*, we found that an officer had violated a suspect's Fourth Amendment right when he breached his duty to conduct a reasonably-thorough investigation prior to arresting the suspect. *Id.* We concluded that "[a]n officer need not conduct a mini-trial before making an arrest, [but an officer must conduct] a minimal investigation" to determine if the suspect can be exonerated. *Id.* at 650 (internal quotations omitted).

As noted, Deputy Aldridge and Deputy Phillips had an objectively reasonable belief that Anderson and Gilio had assaulted Shamp giving rise to probable cause for the arrest. Under the totality of the circumstances, the deputies conducted a reasonably thorough investigation prior to the arrest. There are substantial undisputed facts. When Aldridge interviewed Shamp, she complained that she had been struck by both Anderson and Gilio, while she was handcuffed on the floor. After almost a

---

kidnaped by the suspect. We noted that although the girlfriend's report was admittedly one-sided, it contained sufficient detail to suggest that she spoke truthfully. We concluded that based solely on the complainant's allegations, a reasonably prudent officer would have sufficient grounds to believe that the suspect had committed a serious criminal offense. *Id.* at 816.

two-hour investigation, the deputies collected enough inculpatory evidence to reasonably conclude that the attempt to revoke Shamp's bond had risen to a level of criminal activity. We agree with the district court that the undisputed facts show that probable cause supported the deputies' warrantless arrest of Anderson and Gilio. Thus, the district court properly granted judgment as a matter of law dismissing the action against Cass County deputies.[6]

## B. *Qualified Immunity*

As noted above, we find that the deputies had probable cause to arrest both Anderson and Gilio. Based on this determination, we need not reach the merits of Gilio and Anderson's claim that the deputies did not have qualified immunity.

## C. *Equal Protection Violation*

Anderson and Gilio next contend that the district court erred in granting Cass County deputies' motion for judgment as a matter of law because they were "unlawfully singled out and accused of a crime of which no evidence existed" in violation of their Fourteenth Amendment rights.[7] The appellants urge us to find that the deputies violated their Equal Protection rights by not arresting Gerrard on the night of the incident. We find this argument unpersuasive.

Generally, the Equal Protection Clause "requires the government to treat similarly situated people alike." *Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994). Yet, different treatment of dissimilarly situated persons does not

---

[6] Because we find that the district court properly concluded that there was probable cause to arrest both Anderson and Gilio, we do not address their remaining failure-to-train argument. In *Roach v. City of Fredericktown, MO.*, 882 F.2d 294, 298 (8th Cir. 1989), we held that because there was not a violation of the plaintiff's constitutional rights by the municipal police officer, the municipality could not be held liable for inadequate training.

[7] Appellants' Brief, p. 38.

violate the equal protection clause. *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 242 (8th Cir. 1994). Before we may reach the merits of the Equal Protection claim, we must determine whether Anderson and Gilio demonstrated that they were similarly situated to Gerrard.

Here, the appellants allege that they were treated differently from Gerrard. To support this contention, the appellants cite the fact that Shamp, in her interview with Deputy Aldridge, stated that Gerrard had thrown her to the ground on at least two occasions. Anderson and Gilio urge that this would explain the redness on Shamp's face. We disagree. First, Gerrard was outside Shamp's residence when the deputies arrived. Second, when the deputies entered the home, they observed Anderson and Gilio standing over Shamp, who was handcuffed and sitting in a corner of the living room. Third, Shamp claimed that Anderson and Gilio had struck her in the face while handcuffed and made no similar allegation against Gerrard. Anderson and Gilio have failed to make the requisite threshold showing that they were similarly situated to Gerrard on the morning of the arrest. For this reason, we find that there is no equal protection violation.[8]

D. *Evidentiary Ruling Concerning Lost Wages*

Finally, Anderson and Gilio argue that the district court abused its discretion in denying the admission of evidence of their lost wages and lost earnings. Because we affirm the district court's grant of judgment as a matter of law on the question of liability, there is no need to address an evidentiary issue on the question of damages.

---

[8] Also, the appellants contend that Aldridge, at the time of the arrest, had animus against Anderson. If there was probable cause to arrest Anderson, based on an objective reasonableness standard, the subjective motivations of the arresting police officers are irrelevant. *Hannah*, 795 F.2d at 1390.

III. *Conclusion*

For the reasons set forth above, we hold that the district court did not err in (1) finding that the arresting deputies had probable cause; (2) granting Cass County deputies' motion for judgment as a matter of law; and (3) finding that Gerrard was not similarly situated with Anderson and Gilio. Accordingly, the judgment of the district court is affirmed.

_____